(Slip Opinion) OCTOBER TERM, 2022 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ABITRON AUSTRIA GMBH ET AL. *v.* HETRONIC INTERNATIONAL, INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 21–1043. Argued March 21, 2023—Decided June 29, 2023

This case requires the Court to decide the foreign reach of 15 U. S. C. §1114(1)(a) and §1125(a)(1), two provisions of the Lanham Act that prohibit trademark infringement. The case concerns a trademark dispute between Hetronic (a U. S. company) and six foreign parties (collectively Abitron). Hetronic manufactures remote controls for construction equipment. Abitron, once a licensed distributor for Hetronic, claimed ownership of the rights to much of Hetronic's intellectual property and began employing Hetronic's marks on products it sold.

Hetronic sued Abitron in the Western District of Oklahoma for trademark violations under two related provisions of the Lanham Act, both of which prohibit the unauthorized use in commerce of protected marks when, *inter alia*, that use is likely to cause confusion. See §§1114(1)(a), 1125(a)(1). Hetronic sought damages for Abitron's infringing acts worldwide. Abitron argued that Hetronic sought an impermissible extraterritorial application of the Lanham Act. The District Court rejected Abitron's argument, and a jury later awarded Hetronic approximately $96 million in damages related to Abitron's global employment of Hetronic's marks. The District Court also entered a permanent injunction preventing Abitron from using Hetronic's marks anywhere in the world. On appeal, the Tenth Circuit narrowed the injunction, but otherwise affirmed the judgment, concluding that the Lanham Act extended to "all of [Abitron's] foreign infringing conduct."

*Held*: Applying the presumption against extraterritoriality, §1114(1)(a) and §1125(a)(1) of the Lanham Act are not extraterritorial and extend only to claims where the infringing use in commerce is domestic. Pp. 3–15.

Syllabus

(a) The presumption against extraterritoriality reflects the longstanding principle "that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. 247, 255. The presumption "serves to avoid the international discord that can result when U. S. law is applied to conduct in foreign countries" and reflects the "commonsense notion that Congress generally legislates with domestic concerns in mind." *RJR Nabisco, Inc.* v. *European Community*, 579 U. S. 325, 335–336.

Applying the presumption involves a two-step framework, which asks at step one whether the statute is extraterritorial. This step turns on whether "Congress has affirmatively and unmistakably instructed that" the provision at issue should "apply to foreign conduct." *Id.*, at 335. If Congress has provided such an instruction, then the provision is extraterritorial. If not, then the provision is not extraterritorial and step two applies. That step resolves whether a suit seeks a (permissible) domestic or (impermissible) foreign application of the provision. That determination requires courts to identify the "focus" of congressional concern underlying the provision at issue, *id.*, at 336, and then "as[k] whether the conduct relevant to that focus occurred in United States territory," *WesternGeco LLC* v. *ION Geophysical Corp.*, 585 U. S. ___, ___. Thus, to prove that a claim involves a domestic application of a statute, "plaintiffs must establish that 'the *conduct relevant to the statute's focus* occurred in the United States.'" *Nestlé USA, Inc.* v. *Doe*, 593 U. S. ___, ___ (emphasis added). Step two is designed to apply the presumption to claims that involve both domestic and foreign conduct, separating the activity that matters from the activity that does not. After all, the Court has long recognized that the presumption would be meaningless if any domestic conduct could defeat it. See *Morrison*, 561 U. S., at 266. Pp. 3–5.

(b) Neither provision at issue provides an express statement of extraterritorial application or any other clear indication that it is one of the "rare" provisions that nonetheless applies abroad. Both simply prohibit the use "in commerce" of protected trademarks when that use "is likely to cause confusion." §§1114(1)(a), 1125(a)(1). Hetronic maintains that the Lanham Act's definition of "commerce"—"all commerce which may lawfully be regulated by Congress," §1127—rebuts the presumption against extraterritoriality. But this Court's repeated holding that "'even statutes . . . that expressly refer to '*foreign* commerce'" when defining "commerce" are not extraterritorial, *Morrison*, 561 U. S., at 262–263, dooms Hetronic's arguments. Pp. 5–7.

(c) Because §1114(1)(a) and §1125(a)(1) are not extraterritorial, the Court must consider at step two when claims involve "domestic" appli-

cations of these provisions. Under the proper test, the ultimate question regarding permissible domestic application turns on the location of the conduct relevant to the focus of the statutory provisions. But much of the parties' dispute in this case misses this critical point and centers on the "focus" of the relevant provisions without regard to the "conduct relevant to that focus." *WesternGeco*, 585 U. S., at \_\_\_. Abitron contends that §1114(1)(a) and §1125(a)(1) focus on preventing infringing use of trademarks, while Hetronic argues that they focus both on protecting the goodwill of mark owners and on preventing consumer confusion. The United States as *amicus curiae* argues that the provisions focus only on likely consumer confusion. The parties all seek support for their positions in *Steele* v. *Bulova Watch Co.*, 344 U. S. 280, but because *Steele* implicated both domestic conduct and a likelihood of domestic confusion, *Steele* does not answer which one determines the domestic applications of the provisions here.

The ultimate question regarding permissible domestic application turns on the location of the conduct relevant to the focus. See, *e.g.*, *RJR Nabisco*, 579 U. S., at 337. And the *conduct* relevant to any focus the parties have proffered is infringing use in commerce, as defined by the Act. This conclusion follows from the text and context of both provisions. Both provisions prohibit the unauthorized "use in commerce" of a protected trademark when that use "is likely to cause confusion." In other words, Congress proscribed the use of a mark in commerce under certain conditions. This conduct, to be sure, must create a sufficient risk of confusion, but confusion is not a separate requirement; rather, it is simply a necessary characteristic of an offending use. Because Congress has premised liability on a specific action (a particular sort of use in commerce), that specific action would be the conduct relevant to any focus on offer today. *WesternGeco*, 585 U. S., at \_\_\_–\_\_\_.

In sum, §1114(1)(a) and §1125(a)(1) are not extraterritorial, and "use in commerce" provides the dividing line between foreign and domestic applications of these provisions. The proceedings below were not in accord with this understanding of extraterritoriality. Pp. 7–10, 14–15.

10 F. 4th 1016, vacated and remanded.

ALITO, J., delivered the opinion of the Court, in which THOMAS, GORSUCH, KAVANAUGH, and JACKSON, JJ., joined. JACKSON, J., filed a concurring opinion. SOTOMAYOR, J., filed an opinion concurring in the judgment, in which ROBERTS, C. J., and KAGAN and BARRETT, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

————

No. 21–1043

————

## ABITRON AUSTRIA GₘBH, ₑₜ AL., PETITIONERS *v.* HETRONIC INTERNATIONAL, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[June 29, 2023]

JUSTICE ALITO delivered the opinion of the Court.

This case requires us to decide the foreign reach of 15 U. S. C. §1114(1)(a) and §1125(a)(1), two provisions of the Lanham Act that prohibit trademark infringement. Applying the presumption against extraterritoriality, we hold that these provisions are not extraterritorial and that they extend only to claims where the claimed infringing use in commerce is domestic.

I

This case concerns a trademark dispute between a United States company (Hetronic International, Inc.) and six foreign parties (five companies and one individual (collectively Abitron)).[1]  Hetronic manufactures radio remote controls for construction equipment.  It sells and services these products, which employ "a distinctive black-and-yellow color scheme to distinguish them from those of its competitors," in more than 45 countries.  10 F. 4th 1016, 1024 (CA10 2021) (case below).

———————

[1] The foreign companies are Abitron Germany GmbH, Abitron Austria GmbH, Hetronic Germany GmbH, Hydronic-Steuersysteme GmbH, and ABI Holding GmbH.

Abitron originally operated as a licensed distributor for Hetronic, but it later concluded that it held the rights to much of Hetronic's intellectual property, including the marks on the products at issue in this suit. After reverse engineering Hetronic's products, Abitron began to sell Hetronic-branded products that incorporated parts sourced from third parties. Abitron mostly sold its products in Europe, but it also made some direct sales into the United States.

Hetronic sued Abitron in the Western District of Oklahoma for, as relevant here, trademark violations under two related provisions of the Lanham Act. First, it invoked §1114(1)(a), which prohibits the unauthorized "use in commerce [of] any reproduction . . . of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services" when "such use is likely to cause confusion." Hetronic also invoked §1125(a)(1), which prohibits the "us[e] in commerce" of a protected mark, whether registered or not, that "is likely to cause confusion." Hetronic sought damages under these provisions for Abitron's infringing acts worldwide.

Throughout the proceedings below, Abitron argued that Hetronic sought an impermissible extraterritorial application of the Lanham Act. But the District Court rejected this argument, and a jury later awarded Hetronic approximately $96 million in damages related to Abitron's global employment of Hetronic's marks. This amount thus included damages from Abitron's direct sales to consumers in the United States, its foreign sales of products for which the foreign buyers designated the United States as the ultimate destination, and its foreign sales of products that did not end up in the United States. The District Court later entered a permanent injunction preventing Abitron from using the marks anywhere in the world. On appeal, the Tenth Circuit narrowed the injunction to cover only certain countries but otherwise affirmed the judgment. It concluded

that the Lanham Act extended to "all of [Abitron's] foreign infringing conduct" because the "impacts within the United States [were] of a sufficient character and magnitude as would give the United States a reasonably strong interest in the litigation." 10 F. 4th, at 1046.

We granted certiorari to resolve a Circuit split over the extraterritorial reach of the Lanham Act. 598 U. S. \_\_\_ (2023).

## II
## A

"It is a 'longstanding principle of American law "that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."'" *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. 247, 255 (2010). We have repeatedly explained that this principle, which we call the presumption against extraterritoriality, refers to a "presumption against application to conduct in the territory of another sovereign." *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. 108, 119 (2013) (citing *Morrison*, 561 U. S., at 265). In other words, exclusively "'[f]oreign conduct is generally the domain of foreign law.'" *Microsoft Corp.* v. *AT&T Corp.*, 550 U. S. 437, 455 (2007) (alteration omitted). The presumption "serves to avoid the international discord that can result when U. S. law is applied to conduct in foreign countries" and reflects the "'commonsense notion that Congress generally legislates with domestic concerns in mind.'" *RJR Nabisco, Inc.* v. *European Community*, 579 U. S. 325, 335–336 (2016).

Applying the presumption against extraterritoriality involves "a two-step framework." *Id.*, at 337. At step one, we determine whether a provision is extraterritorial, and that determination turns on whether "Congress has affirmatively and unmistakably instructed that" the provision at issue should "apply to foreign conduct." *Id.*, at 335, 337;

accord, *Kiobel*, 569 U. S., at 117 (asking whether Congress "intends federal law to apply to conduct occurring abroad"); *Nestlé USA, Inc.* v. *Doe*, 593 U. S. ___, ___ (2021) (slip op., at 3). If Congress has provided an unmistakable instruction that the provision is extraterritorial, then claims alleging exclusively foreign conduct may proceed, subject to "the limits Congress has (or has not) imposed on the statute's foreign application." *RJR Nabisco*, 579 U. S., at 337–338.

If a provision is not extraterritorial, we move to step two, which resolves whether the suit seeks a (permissible) domestic or (impermissible) foreign application of the provision.[2] To make that determination, courts must start by identifying the "'"focus" of congressional concern'" underlying the provision at issue. *Id.*, at 336. "The focus of a statute is 'the object of its solicitude,' which can include the conduct it 'seeks to "regulate,"' as well as the parties and interests it 'seeks to "protect"' or vindicate." *WesternGeco LLC* v. *ION Geophysical Corp.*, 585 U. S. ___, ___ (2018) (slip op., at 6) (alterations omitted).

Step two does not end with identifying statutory focus. We have repeatedly and explicitly held that courts must "identif[y] 'the statute's "focus"' *and* as[k] whether the *conduct relevant to that focus* occurred in United States territory." *Id.*, at ___ (slip op., at 5) (emphasis added); accord, *e.g.*, *RJR Nabisco*, 579 U. S., at 337. Thus, to prove that a claim involves a domestic application of a statute, "plaintiffs must establish that 'the *conduct relevant to the statute's focus* occurred in the United States.'" *Nestlé*, 593 U. S., at ___–___ (slip op., at 3–4) (emphasis added); see, *e.g.*, *WesternGeco*, 585 U. S., at ___–___ (slip op., at 6–8) (holding that a claim was a domestic application of the Patent Act because the infringing acts—the conduct relevant to the focus

───────────

[2] As we have noted, courts may take these steps in any order. See, *e.g.*, *Yegiazaryan* v. *Smagin*, 599 U. S. ___, ___–___, n. 2 (2023) (slip op., at 6–7, n. 2).

of the provisions at issue—were committed in the United States); *Morrison*, 561 U. S., at 266–267, 271–273 (concluding that a claim was a foreign application of the Securities and Exchange Act because the "purchase-and-sale transactions" at issue occurred outside of the United States).

Step two is designed to apply the presumption against extraterritoriality to claims that involve both domestic and foreign activity, separating the activity that matters from the activity that does not. After all, we have long recognized that the presumption would be meaningless if any domestic conduct could defeat it. See *Morrison*, 561 U. S., at 266. Thus, "'[i]f the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application' of the statute, 'even if other conduct occurred abroad.'" *WesternGeco*, 585 U. S., at \_\_\_ (slip op., at 6) (quoting *RJR Nabisco*, 579 U. S., at 337). And "if the relevant conduct occurred in another country, 'then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U. S. territory.'" *WesternGeco*, 585 U. S., at \_\_\_ (slip op., at 6) (quoting *RJR Nabisco*, 579 U. S., at 337). Of course, if all the conduct "'regarding [the] violations 'took place outside the United States,'" then courts do "not need to determine . . . the statute's 'focus'" at all. *RJR Nabisco*, 579 U. S., at 337. In that circumstance, there would be no domestic conduct that could be relevant to any focus, so the focus test has no filtering role to play. See, *e.g.*, *Nestlé*, 593 U. S., at \_\_\_ (slip op., at 5); *Kiobel*, 569 U. S., at 124.

## B

With this well-established framework in mind, the first question is whether the relevant provisions of the Lanham Act, see §§1114(1)(a), 1125(a)(1), provide "a clear, affirmative indication" that they apply extraterritorially, *RJR*

*Nabisco*, 579 U. S., at 337.[3]  They do not.

It is a "rare statute that clearly evidences extraterritorial effect despite lacking an express statement of extraterritoriality." *Id.*, at 340.  Our decision in *RJR Nabisco* illustrates the clarity required at step one of our framework. There, we held that the Racketeer Influenced and Corrupt Organizations Act could have extraterritorial application in some circumstances because many of its predicate offenses "plainly apply to at least some foreign conduct" and "[a]t least one predicate . . . applies *only* to conduct occurring outside the United States." *Id.*, at 338.

Here, neither provision at issue provides an express statement of extraterritorial application or any other clear indication that it is one of the "rare" provisions that nonetheless applies abroad.  Both simply prohibit the use "in commerce," under congressionally prescribed conditions, of protected trademarks when that use "is likely to cause confusion." §§1114(1)(a), 1125(a)(1).

Hetronic acknowledges that neither provision on its own signals extraterritorial application, but it argues that the requisite indication can be found in the Lanham Act's definition of "commerce," which applies to both provisions.  Under that definition, "'commerce' means all commerce which may lawfully be regulated by Congress." §1127.  Hetronic offers two reasons why this definition is sufficient to rebut the presumption against extraterritoriality.  First, it argues that the language naturally leads to this result because Congress can lawfully regulate foreign conduct under the Foreign Commerce Clause.  Second, it contends that extraterritoriality is confirmed by the fact that this definition is unique in the U. S. Code and thus differs from what it describes as "boilerplate" definitions of "'commerce'" in other

─────────

[3] Our cases sometimes refer to whether the "statute" applies extraterritorially, but the two-step analysis applies at the level of the particular provision implicated.  See, *e.g.*, *RJR Nabisco*, 579 U. S., at 346; *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. 247, 264–265 (2010).

statutes. Brief for Respondent 23.

Neither reason is sufficient. When applying the presumption, "'we have repeatedly held that even statutes . . . that expressly refer to "*foreign* commerce"'" when defining "commerce" are not extraterritorial. *Morrison*, 561 U. S., at 262–263; see also *RJR Nabisco*, 579 U. S., at 344. This conclusion dooms Hetronic's argument. If an express statutory reference to "foreign commerce" is not enough to rebut the presumption, the same must be true of a definition of "commerce" that refers to Congress's authority to regulate foreign commerce. That result does not change simply because the provision refers to "all" commerce Congress can regulate. See *Kiobel*, 569 U. S., at 118 ("[I]t is well established that generic terms like 'any' or 'every' do not rebut the presumption against extraterritoriality"). And the mere fact that the Lanham Act contains a substantively similar definition that departs from the so-called "boilerplate" definitions used in other statutes cannot justify a different conclusion either.

C

Because §1114(1)(a) and §1125(a)(1) are not extraterritorial, we must consider when claims involve "domestic" applications of these provisions. As discussed above, the proper test requires determining the provision's focus and then ascertaining whether Hetronic can "establish that 'the conduct relevant to [that] focus occurred in the United States.'" *Nestlé*, 593 U. S., at \_\_\_–\_\_\_ (slip op., at 3–4).

Much of the parties' dispute in this case misses this critical point and centers on the "focus" of the relevant provisions without regard to the "conduct relevant to that focus." *WesternGeco*, 585 U. S., at \_\_\_ (slip op., at 5). Abitron contends that §1114(1)(a) and §1125(a)(1) focus on preventing infringing use of trademarks, while Hetronic argues that they focus both on protecting the goodwill of mark owners and on preventing consumer confusion. The United States

as *amicus curiae* argues that the provisions focus on only likely consumer confusion.

The parties all seek support for their positions in *Steele* v. *Bulova Watch Co.*, 344 U. S. 280 (1952), but that decision is of little assistance here. There, we considered a suit alleging that the defendant, through activity in both the United States and Mexico, had violated the Lanham Act by producing and selling watches stamped with a trademark that was protected in the United States. Although we allowed the claim to proceed, our analysis understandably did not follow the two-step framework that we would develop decades later. Our decision was instead narrow and factbound. It rested on the judgment that "the facts in the record . . . when viewed as a whole" were sufficient to rebut the presumption against extraterritoriality. *Id.*, at 285. In reaching this conclusion, we repeatedly emphasized *both* that the defendant committed "essential steps" in the course of his infringing conduct in the United States and that his conduct was likely to and did cause consumer confusion in the United States.[4] *Id.*, at 286–287; accord, *e.g.*, *id.*, at 286 ("His operations and their effects were not confined within the territorial limits of a foreign nation"); *id.*, at 288 ("[P]etitioner by his 'own deliberate acts, here and elsewhere, brought about forbidden results within the United States'" (alteration omitted)). Because *Steele* implicated both domestic conduct and a likelihood of domestic confusion, it does not tell us which one determines the domestic applications of §1114(1)(a) and §1125(a)(1).

With *Steele* put aside, then, we think the parties' particular debate over the "focus" of §1114(1)(a) and §1125(a)(1) in the abstract does not exhaust the relevant inquiry. The

───────────

[4] For example, we noted that the trademark owner's "Texas sales representative received numerous complaints from [American] retail jewelers . . . whose customers brought in for repair defective" branded watches. *Steele*, 344 U. S., at 285; accord, *Bulova Watch Co.* v. *Steele*, 194 F. 2d 567, 571 (CA5 1952).

ultimate question regarding permissible domestic applica-
tion turns on the location of the conduct relevant to the fo-
cus. See, *e.g.*, *RJR Nabisco*, 579 U. S., at 337. And the *con-
duct* relevant to any focus the parties have proffered is
infringing use in commerce, as the Act defines it.

This conclusion follows from the text and context of
§1114(1)(a) and §1125(a)(1). Both provisions prohibit the
unauthorized use "in commerce" of a protected trademark
when, among other things, that use "is likely to cause con-
fusion." §§1114(1)(a), 1125(a)(1). In other words, Congress
proscribed the use of a mark in commerce under certain
conditions. This conduct, to be sure, must create a suffi-
cient risk of confusion, but confusion is not a separate re-
quirement; rather, it is simply a necessary characteristic of
an offending use.[5] Because Congress has premised liability
on a specific action (a particular sort of use in commerce),
that specific action would be the conduct relevant to any fo-
cus on offer today. See, *e.g.*, *WesternGeco*, 585 U. S., at \_\_\_–
\_\_\_ (slip op., at 6–8).

In sum, as this case comes to us, "use in commerce" is the
conduct relevant to any potential focus of §1114(1)(a) and
§1125(a)(1) because Congress deemed a violation of either
provision to occur each time a mark is used in commerce in

––––––––

[5] Both provisions "refer to a 'likelihood' of harm, rather than a com-
pleted harm." *Moseley* v. *V Secret Catalogue, Inc.*, 537 U. S. 418, 432
(2003). In other words, "actual confusion is not necessary in order to
prove infringement." Restatement (Third) of Unfair Competition §23, at
250, Comment *b* (1993); accord, *id.*, §23, at 251, Comment *d*; 4 J. McCar-
thy, Trademarks and Unfair Competition §23:12, at 23–157 (5th ed.
2023) (McCarthy) ("'[I]t is black letter law that actual confusion need not
be shown to prevail under the Lanham Act, since . . . the Act requires
only a likelihood of confusion'"). Instead, the provisions treat confusion
as a means to limit liability to only certain "bona fide use[s] of a mark in
the ordinary course of trade." 15 U. S. C. §1127 (defining "use in com-
merce"); see *Patent and Trademark Office* v. *Booking.com B. V.*, 591 U. S.
\_\_\_, \_\_\_ (2020) (slip op., at 12) ("[A] competitor's use does not infringe a
mark [under §1114(1)(a) and §1125(a)(1)] unless it is likely to confuse
consumers").

the way Congress described, with no need for any actual confusion. Under step two of our extraterritoriality standard, then, "use in commerce" provides the dividing line between foreign and domestic applications of these Lanham Act provisions.

## III

Resisting this straightforward application of our precedent, JUSTICE SOTOMAYOR concludes that step two of our extraterritoriality framework turns solely on whether "the object of the statute's focus is found in, or occurs in, the United States." *Post*, at 5 (opinion concurring in judgment). Applied to the Lanham Act, the upshot of this focus-only standard is that any claim involving a *likelihood* of consumer confusion in the United States would be a "domestic" application of the Act. This approach is wrong, and it would give the Lanham Act an untenably broad reach that undermines our extraterritoriality framework.

## A

To justify looking only to a provision's "focus," JUSTICE SOTOMAYOR maintains that "an application of a statute" can still be domestic "when foreign conduct is implicated." *Post*, at 7. If this assertion simply means that a permissible domestic application can occur even when some foreign "activity is involved in the case," *Morrison*, 561 U. S., at 266, then it is true but misses the point. When a claim involves both domestic and foreign activity, the question is whether "'the conduct relevant to the statute's focus occurred in the United States.'" *Nestlé*, 593 U. S., at ___–___ (slip op., at 3–4). If that "'conduct . . . occurred in the United States, then the case involves a permissible domestic application' of the statute 'even if other conduct occurred abroad.'" *Western-Geco*, 585 U. S., at ___ (slip op., at 6). But "if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application

regardless of any other conduct that occurred in U. S. territory." *RJR Nabisco*, 579 U. S., at 337; see, *e.g.*, *WesternGeco*, 585 U. S., at \_\_\_ (slip op., at 6–8); *Nestlé*, 593 U. S., at \_\_\_–\_\_\_ (slip op., at 4–5); *Morrison*, 561 U. S., at 266–267, 271–273.

These holdings were not, as JUSTICE SOTOMAYOR suggests, premised on this Court's "first conclud[ing] (or assum[ing] without deciding) that the focus of the provision at issue *was* conduct." *Post*, at 9. They were unambiguously part of this Court's articulation of the two-step framework, and, in each case, these holdings came *before* we began analyzing the focus of the provisions at issue. For this reason, none of our cases has ever held that statutory focus was dispositive at step two of our framework. To the contrary, we have acknowledged that courts do "not need to determine [a] statute's 'focus'" when all conduct regarding the violations "'took place outside the United States.'" *RJR Nabisco*, 579 U. S., at 337 (quoting *Kiobel*, 569 U. S., at 124); see, *e.g.*, *Nestlé*, 593 U. S., at \_\_\_ (slip op., at 5) ("To plead facts sufficient to support a domestic application of the [Alien Tort Statute], plaintiffs must allege more domestic conduct than general corporate activity"). That conclusion, as well as the decisions applying it, are inexplicable under a focus-only standard. See *supra*, at 5.

Beyond straying from established precedent, a focus-only approach would create headaches for lower courts required to grapple with this new approach. For statutes (like this one) regulating conduct, the location of the conduct relevant to the focus provides a clear signal at both steps of our two-step framework. See *RJR Nabisco*, 579 U. S., at 335, 337. Under JUSTICE SOTOMAYOR's standard, by contrast, litigants and lower courts are told that the step-two inquiry turns on the "'focus'" alone, which (as we have said) "can be 'conduct,' 'parties,' or 'interests' that Congress sought to protect or regulate." *Post*, at 8; see *WesternGeco*, 585 U. S.,

at ___ (slip op., at 6). As a result, almost any claim involving exclusively foreign conduct could be repackaged as a "domestic application." And almost any claim under a non-extraterritorial provision could be defeated by labeling it a "foreign application," even if the conduct at issue was exclusively domestic. This is far from the measure of certainty that the presumption against extraterritoriality is designed to provide.

## B

JUSTICE SOTOMAYOR's expansive understanding of the Lanham Act's domestic applications threatens to negate the presumption against extraterritoriality. In *Morrison*, we warned that "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." 561 U. S., at 266. If a claim under the Act involves a domestic application whenever particular "'effects are likely to occur in the United States,'" *post*, at 5–6, the watchdog is nothing more than a muzzled Chihuahua. Under such a test, it would not even be necessary that "some" domestic activity be involved. It would be enough for there to be merely a *likelihood* of an *effect* in this country. Applying that standard here would require even less connection to the United States than some explicitly extraterritorial statutes, which must have, at a minimum, actual domestic effects to be invoked. See, *e.g.*, *Hartford Fire Ins. Co.* v. *California*, 509 U. S. 764, 796 (1993) (holding that the extraterritorial provision at issue "applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States").

This approach threatens "'international discord.'" *Kiobel*, 569 U. S., at 115. In nearly all countries, including the United States, trademark law is territorial—*i.e.*, "a trademark is recognized as having a separate existence in each

sovereign territory in which it is registered or legally recognized as a mark." 5 McCarthy §29:1, at 29–4 to 29–5. Thus, each country is empowered to grant trademark rights and police infringement within its borders. See, *e.g.*, *ibid.*; *Ingenohl* v. *Olsen & Co.*, 273 U. S. 541, 544 (1927); *A. Bourjois & Co.* v. *Katzel*, 260 U. S. 689, 692 (1923).

This principle has long been enshrined in international law. Under the Paris Convention for the Protection of Industrial Property, July 14, 1967, 21 U. S. T. 1583, T. I. A. S. No. 6923, a "mark duly registered in a country of the Union shall be regarded as independent of marks registered in other countries of the Union," and the seizure of infringing goods is authorized "on importation" to a country "where such mark or trade name is entitled to legal protection." Arts. 6(3), 9(1), *id.*, at 1639, 1647. The Convention likewise provides mechanisms for trademark holders to secure trademark protection in other countries under the domestic law of those countries. Arts. 2(1), 4(1)–(2), *id.*, at 1631–1632; see also 5 McCarthy §29:1, at 29–6 to 29–7; Protocol Relating to Madrid Agreement Concerning International Registration of Marks, June 27, 1989, T. I. A. S. No. 03–112, S. Treaty Doc. No. 106–41 (entered into force Dec. 1, 1995) (providing mechanisms for the extension of trademark protection to multiple jurisdictions under domestic law). The Lanham Act, which is designed to implement "treaties and conventions respecting trademarks," §1127, incorporates this territorial premise, mandating that registration of a foreign trademark in the United States "shall be independent of the registration in the country of origin" and that the rights of that mark in the United States are governed by domestic law, §1126(f).

Because of the territorial nature of trademarks, the "probability of incompatibility with the applicable laws of other counties is so obvious that if Congress intended such foreign application 'it would have addressed the subject of conflicts with foreign laws and procedures.'" *Morrison*, 561

U. S., at 269.  The use of a mark—even confined to one country—will often have effects that radiate to any number of countries.  And when determining exactly what form of abstract consumer confusion is sufficient in a given case, the Judiciary would be thrust into the unappetizing task of "navigating foreign policy disputes belong[ing] to the political branches."  *Jesner* v. *Arab Bank, PLC*, 584 U. S. ___, ___ (2018) (GORSUCH, J., concurring in part and concurring in judgment) (slip op., at 1).  If enough countries took this approach, the trademark system would collapse.

This tension has not been lost on other sovereign nations.  The European Commission gravely warns this Court against applying the Lanham Act "to *acts of infringement* occurring . . . in the European Union" and outside of the United States.  Brief for European Commission on Behalf of the European Union as *Amicus Curiae* 4 (emphasis added).  To "police allegations of infringement occurring in Germany," it continues, would be an "unseemly" act of "meddling in extraterritorial affairs," given "international treaty obligations that equally bind the United States."  *Id.*, at 28.  As the Commission and other foreign *amici* recognize, the "system only works if all participating states respect their obligations, including the limits on their power."  *Id.*, at 29; see also, *e.g.*, Brief for German Law Professors as *Amici Curiae* 12; Brief for Guido Westkamp as *Amicus Curiae* 2–3.  It thus bears repeating our longstanding admonition that "United States law governs domestically but does not rule the world."  *Microsoft Corp.*, 550 U. S., at 454.

IV

In sum, we hold that §1114(1)(a) and §1125(a)(1) are not extraterritorial and that the infringing "use in commerce" of a trademark provides the dividing line between foreign and domestic applications of these provisions.  Under the Act, the "term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade," where the mark

serves to "identify and distinguish [the mark user's] goods . . . and to indicate the source of the goods." §1127.[6]  Because the proceedings below were not in accord with this understanding of extraterritoriality, we vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

_____

[6] JUSTICE JACKSON has proposed a further elaboration of "use in commerce," see *post*, at 1–4 (concurring opinion), but we have no occasion to address the precise contours of that phrase here.

# SUPREME COURT OF THE UNITED STATES

———————

No. 21–1043

———————

## ABITRON AUSTRIA GmBH, ET AL., PETITIONERS *v.* HETRONIC INTERNATIONAL, INC.

*ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT*

[June 29, 2023]

JUSTICE JACKSON, concurring.

I agree with the Court that 15 U. S. C. §1114(1)(a) and §1125(a)(1) do not apply extraterritorially. *Ante*, at 7. I also agree that the "'use in commerce' of a trademark" that both statutory sections describe "provides the dividing line between foreign and domestic applications" of these provisions. *Ante*, at 14. The Court has no need to elaborate today upon what it means to "use [a trademark] in commerce," §1127, nor need it discuss how that meaning guides the permissible-domestic-application question in a particular case. I write separately to address those points.

It is clear beyond cavil that what makes a trademark a trademark under the Lanham Act is its source-identifying function. See *Jack Daniel's Properties, Inc.* v. *VIP Products LLC*, 599 U. S. \_\_\_, \_\_\_ (2023) (slip op., at 3); *Qualitex Co.* v. *Jacobson Products Co.*, 514 U. S. 159, 162–163 (1995). That is, under the Act, a trademark is "any word, name, symbol, or device, or any combination thereof," that "a person" "use[s]" or "inten[ds] to use" "to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods." §1127; see also *Qualitex Co.*, 514 U. S., at 162–163 (emphasizing centrality of this source-identifying function). Sections 1114(1)(a) and 1125(a)(1) permit a mark owner to sue someone who is "us[ing that] mark in commerce" in a way "'likely

to cause confusion, or to cause mistake, or to deceive.'" *B&B Hardware, Inc.* v. *Hargis Industries, Inc.*, 575 U. S. 138, 144 (2015).

Critically, the Act defines "'use in commerce'" as "the bona fide use of a mark in the ordinary course of trade." §1127. And, in light of the core source-identifying function of marks, Congress's statutory scheme embodies a distinction between *trademark* uses (use of a symbol or equivalent "'to identify or brand [a defendant's] goods or services'") and "'non-trademark uses'" (use of a symbol—even the same one—"in a 'non-source-identifying way'"). *Jack Daniel's*, 599 U. S., at ___ (slip op., at 13). This all points to something key about what it means to use a trademark in the sense Congress prohibited—*i.e.*, in a way likely to commit the "cardinal sin" of "confus[ing] consumers about source." *Id.*, at ___ (slip op., at 14).

Simply put, a "use in commerce" does not cease at the place the mark is first affixed, or where the item to which it is affixed is first sold. Rather, it can occur wherever the mark serves its source-identifying function. So, even after a trademark begins to be "use[d] in commerce" (say, when goods on which it is placed are sold), that trademark is also "use[d] in commerce" wherever and whenever those goods are in commerce, because as long as they are, the trademark "identif[ies] and distinguish[es] . . . the source of the goods." §1127. Such a use is not free-floating; the trademark is being used *by* the "person" who put that trademark on the goods "to identify and distinguish" them in commerce and "indicate the[ir] source." *Ibid.* This is the "use in commerce" to which §1114(1)(a) and §1125(a)(1) refer.

Because it is "use in commerce"—as Congress has defined it—that "provides the dividing line between foreign and domestic applications of" these provisions, *ante*, at 14, the permissible-domestic-application inquiry ought to be straightforward. If a marked good is in domestic commerce, and the mark is serving a source-identifying function in the

way Congress described, §1114(1)(a) and §1125(a)(1) may reach the "person," §1127, who is "us[ing that m]ark as a trademark," *Jack Daniel's*, 599 U. S., at \_\_\_ (slip op., at 14). But if the mark is *not* serving that function in domestic commerce, then the conduct Congress cared about is not occurring domestically, and these provisions' purely domestic sweep cannot touch that person.

Consider an example. Imagine that a German company begins making and selling handbags in Germany marked "Coache" (the owner's family name). Next, imagine that American students buy the bags while on spring break overseas, and upon their return home employ those bags to carry personal items. Imagine finally that a representative of Coach (the United States company) sees the students with the bags and persuades Coach to sue the German company for Lanham Act infringement, fearing that the "Coache" mark will cause consumer confusion. Absent additional facts, such a claim seeks an impermissibly extraterritorial application of the Act. The mark affixed to the students' bags is not being "use[d] in commerce" domestically as the Act understands that phrase: to serve a source-identifying function "in the ordinary course of trade," §1127.

Now change the facts in just one respect: The American students tire of the bags six weeks after returning home, and resell them in this country, confusing consumers and damaging Coach's brand. *Now*, the marked bags are in domestic commerce; the marks that the German company affixed to them overseas continue "to identify and distinguish" the goods from others in the (now domestic) marketplace and to "indicate the source of the goods." *Ibid.* So the German company continues to "use [the mark] in commerce" within the meaning of the Act, thus triggering potential liability under §1114(1)(a) and §1125(a)(1). This result makes eminent sense given the source-identifying

function of a trademark.[1]

In brief, once the marks on its bags are serving their core source-identifying function in commerce in the United States, this German company is doing—domestically—exactly what Congress sought to proscribe. Accordingly, the German company may be subject to liability for this domestic conduct—*i.e.*, it cannot successfully obtain dismissal of the lawsuit on extraterritoriality grounds—even though it never sold the bags in, or directly into, the United States.[2]

Guided by this understanding of "use in commerce," I join the Court's opinion in full.

———————

[1] Trademarks facilitate the accumulation of business goodwill whenever and wherever marked goods are in commerce. The manufacturer of source-marked goods reaps a goodwill benefit to the extent that consumers like its product, see *Two Pesos, Inc.* v. *Taco Cabana, Inc.*, 505 U. S. 763, 774 (1992), and that benefit runs to the manufacturer whenever a trademark is serving a source-identifying function with respect to items in commerce—however that commercial status came to be.

[2] I will not attempt to discuss every way in which a marked item might be "in commerce" such that the trademark is being used "in the ordinary course of trade" domestically. §1127. But, in the internet age, one could imagine a mark serving its critical source-identifying function in domestic commerce even absent the domestic physical presence of the items whose source it identifies. See, *e.g.,* 5 J. McCarthy, Trademarks and Unfair Competition §29:56 (5th ed. Supp. 2023) ("The use of an infringing mark as part of an Internet site available for use in the United States may constitute an infringement of the mark in the United States"); 4 *id.*, §25:54.50 ("When an alleged infringing mark is used on the internet, the use is clearly a 'use in commerce'"); 1 *id.*, §3:7 (discussing "evidence of use as a trademark" where "a designation is prominently displayed in a way easily recognized by web users as an indicator of origin"; accord, *In re Sones*, 590 F. 3d 1282, 1288 (CA Fed. 2009) (observing, with respect to the use-in-commerce requirement, that a "'website [can be] an electronic retail store, and the web page [can be] a shelf-talker or banner which encourages the consumer to buy the product'").

# SUPREME COURT OF THE UNITED STATES

─────────────

No. 21–1043

─────────────

## ABITRON AUSTRIA GMBH, ET AL., PETITIONERS *v.* HETRONIC INTERNATIONAL, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[June 29, 2023]

JUSTICE SOTOMAYOR, with whom THE CHIEF JUSTICE, JUSTICE KAGAN, and JUSTICE BARRETT join, concurring in the judgment.

Sections 32(1)(a) and 43(a)(1)(A) of the Lanham Act prohibit trademark infringement and unfair competition activities that are "likely to cause confusion, or to cause mistake, or to deceive." 60 Stat. 437, 441, as amended, 15 U. S. C. §§1114(1)(a), 1125(a)(1)(A).[1] The issue in this case is whether, and to what extent, these provisions apply to activities that occur in a foreign country. I agree with the majority's conclusion that the decision below must be vacated. I disagree, however, with the extraterritoriality framework that the Court adopts today. In my view, §§32(1)(a) and 43(a)(1)(A) of the Lanham Act extends to activities carried out abroad when there is a likelihood of consumer confusion in the United States.

I

This Court previously considered the extraterritoriality of the Lanham Act in *Steele* v. *Bulova Watch Co.*, 344 U. S. 280 (1952). There, the Court applied the Lanham Act to trademark infringement and unfair competition activities that occurred abroad but confused consumers in the United

───────────

[1] For simplicity, this opinion refers to this likelihood of "confusion," "mistake," or "decei[t]" as likelihood of consumer confusion.

States. See *id.,* at 281, 286–287. Because the Court decided *Steele* 70 years ago, it had no occasion to apply the two-step framework that the Court has since developed for evaluating the extraterritorial reach of a statute. A proper application of that framework, however, leads to a result consistent with *Steele*: Although there is no clear indication that the Lanham Act provisions at issue rebut the presumption against extraterritoriality at step one, a domestic application of the statute can implicate foreign conduct at step two, so long as the plaintiff proves a likelihood of consumer confusion domestically.

### A

In *Steele*, the Bulova Watch Company, Inc., a New York corporation that marketed watches under the registered U. S. mark "Bulova," sued Sidney Steele, a U. S. citizen and resident of Texas with a watch business in Mexico City. *Id.*, at 281, 284. Upon discovering that the mark "Bulova" was not registered in Mexico, Steele obtained the Mexican registration of the mark, assembled watches in Mexico using component parts he had procured from the United States and Switzerland, and "stamped his watches with 'Bulova' and sold them as such." *Id.*, at 281, 284–285. As a result, "spurious 'Bulovas' filtered through the Mexican border into this country," causing a Bulova Watch Company's sales representative in the United States to "receiv[e] numerous complaints from retail jewelers in the Mexican border area [of Texas] whose customers brought in for repair defective 'Bulovas' which upon inspection often turned out not to be products of that company." *Id.*, at 285–286. Steele "committed no illegal acts within the United States." *Id.,* at 282.

The Court held that, because Steele's "operations and their effects were not confined within the territorial limits of a foreign nation," the Lanham Act applied to Steele's activities. *Id.,* at 286. The Court emphasized that Steele's conduct had the potential to "reflect adversely on Bulova

Watch Company's trade reputation" in the United States. *Ibid.* By contrast, the fact that Steele "affixed the mark 'Bulova' in Mexico City rather than here" was not "material." *Id.*, at 287.

### B

Following *Steele*, the Courts of Appeals developed various tests, modeled after *Steele*'s facts, to address the Lanham Act's extraterritorial reach.[2] This Court also subsequently adopted a two-step framework for determining when a statute can apply extraterritorially to foreign conduct. That framework implements "a canon of statutory construction known as the presumption against extraterritoriality." *RJR Nabisco, Inc.* v. *European Community,* 579 U. S. 325, 335 (2016). The presumption reflects the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. 247, 255 (2010) (internal quotation marks omitted). That is, courts presume that, "in general, 'United States law governs domestically but does not rule the world.'" *RJR Nabisco*, 579 U. S., at 335 (quoting *Microsoft Corp.* v. *AT&T Corp.*, 550 U. S. 437, 454 (2007)).

Under this framework, the Court first asks "whether the presumption against extraterritoriality has been rebutted" by "a clear, affirmative indication that [the statute] applies extraterritorially." *RJR Nabisco*, 579 U. S., at 337. If the presumption is not rebutted at that first step, the Court

---

[2] See, *e.g., Trader Joe's Co.* v. *Hallatt*, 835 F. 3d 960, 969 (CA9 2016); *McBee* v. *Delica Co.*, 417 F. 3d 107, 111 (CA1 2005); *International Cafe, S. A. L.* v. *Hard Rock Cafe Int'l (U. S. A.), Inc.*, 252 F. 3d 1274, 1278 (CA11 2001); *Aerogroup Int'l, Inc.* v. *Marlboro Footworks, Ltd.*, 152 F. 3d 948 (CA Fed. 1998); *Nintendo of Am., Inc.* v. *Aeropower Co.*, 34 F. 3d 246, 250 (CA4 1994); *American Rice, Inc.* v. *Arkansas Rice Growers Cooperative Assn.*, 701 F. 2d 408, 414, n. 8 (CA5 1983); *Vanity Fair Mills, Inc.* v. *T. Eaton Co.*, 234 F. 2d 633, 642–643 (CA2 1956).

then proceeds to determine at step two "whether the case involves a domestic application of the statute." *Ibid.* To determine whether a domestic application exists, the Court must ascertain the statute's "focus," *i.e.*, "the objec[t] of the statute's solicitude." *Morrison*, 561 U. S., at 266–267.

As I explain below, although I agree with the result the Court reaches with respect to the first step, I disagree with its analysis at step two.

1

Sections 32(1)(a) and 43(a)(1)(A) of the Lanham Act impose civil liability on a defendant who "use[s] in commerce" a trademark in a manner that is "likely to cause confusion, or to cause mistake, or to deceive." 15 U. S. C. §§1114(1)(a), 1125(a)(1)(A). The Act in turn defines "commerce" as "all commerce which may lawfully be regulated by Congress." §1127.

Under this Court's precedents, this language is insufficient to rebut the presumption against extraterritoriality at step one. The Court has "repeatedly held that even statutes that contain broad language in their definitions of 'commerce' that expressly refer to '*foreign* commerce' do not apply abroad" to all foreign conduct. *Morrison*, 561 U. S., at 262–263 (internal quotation marks omitted); see also *RJR Nabisco*, 579 U. S., at 344 (a statute's reference to "foreign commerce" does not "mean literally all commerce occurring abroad"). The Court has also explained "that generic terms like 'any' or 'every' do not rebut the presumption." *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. 108, 118 (2013). The term "all" is not meaningfully different. While "the word conveys breadth," *Peter* v. *NantKwest, Inc.*, 589 U. S. ___, ___ (2019) (slip op., at 7), it does not rebut the presumption either.

2

The Court's inquiry at step two centers on the "focus" of

the statutory provisions. Like the Court's analysis at step one, this inquiry is contextual; the Court "do[es] not analyze the provision at issue in a vacuum." *WesternGeco LLC* v. *ION Geophysical Corp.*, 585 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 6). Rather, the Court looks at the provision "in concert" with other relevant provisions and considers "how the statute has actually been applied." *Ibid.* The aim of determining the statutory focus is to assess what constitutes a domestic application of the statute. An application is domestic when the object of the statute's focus is found in, or occurs in, the United States. See, *e.g.*, *Morrison*, 561 U. S., at 266–267, 273 (where the "focus of the Exchange Act" is "purchases and sales of securities," there is no domestic application of the statute when those purchases and securities "occurred outside the United States," regardless of "the place where the deception originated").

The parties offer different interpretations of the focus of §§32(1)(a) and 43(a)(1)(A). Petitioners argue that the focus of the statute is the "use" of the mark "in commerce." Brief for Petitioners 39. Under petitioners' theory, the Lanham Act does not reach any infringing products sold abroad; instead, the defendant must sell the products directly into the United States. *Id.,* at 44–45. Respondent, by contrast, argues that the Act has two distinct focuses: protecting mark owners from reputational harm and protecting consumers from confusion. Brief for Respondent 45–48. Under respondent's view, reputational harm to the mark owner "is not necessarily tied to the locus of [consumer] confusion or the locus of the [defendant's] conduct." *Id.,* at 47. Instead, respondent asserts, harm to a mark owner's reputation "is felt where [the mark owner] resides." *Ibid.* The Government, as *amicus curiae* supporting neither party, offers a middle ground. In its view, the focus of the statute is consumer confusion. See Brief for United States as *Amicus Curiae* 14 (United States Brief ). Accordingly, "[w]here such effects are likely to occur in the United States, application

of Sections 32(1)(a) and 43(a)(1)(A) is a permissible domestic application of the Act, even if the defendant's own conduct occurred elsewhere." *Ibid.*

I agree with the Government's position. Sections 32(1)(a) and 43(a)(1)(A) of the Act prohibit specific types of "use[s] in commerce": uses that are "likely to cause confusion, or to cause mistake, or to deceive." 15 U. S. C. §§1114(1)(a), 1125(a)(1)(A). The statute thus makes clear that prohibiting the use in commerce is "merely the means by which the statute achieves its end" of protecting consumers from confusion. *WesternGeco LLC,* 585 U. S., at ___ (slip op., at 8). Stated differently, "a competitor's use does not infringe a mark unless it is likely to confuse consumers." *Patent and Trademark Office* v. *Booking.com B.V.*, 591 U. S. ___, ___ (2020) (slip op., at 12); see 4 J. McCarthy, Trademarks and Unfair Competition §23:1, p. 23–9 (5th ed. 2023) (McCarthy) ("[L]ikelihood of confusion is the keystone of trademark infringement"). Because the statute's focus is protection against consumer confusion, the statute covers foreign infringement activities if there is a likelihood of consumer confusion in the United States and all other conditions for liability are established. See *infra,* at 12.

Treating consumer confusion as the focus of the Act is consistent with *Steele*, which focused on the domestic "effects" of the defendant's foreign conduct. 344 U. S., at 286. *Steele* emphasized that, although the defendant did not affix the mark or sell the products in the United States, "spurious 'Bulovas' filtered through the Mexican border into this country," causing consumer confusion here. *Id.*, at 285–287. These domestic effects, the Court reasoned, could "reflect adversely on Bulova Watch Company's trade reputation" in the United States. *Id.,* at 286. In other words, consistent with the statutory text, *Steele* focused on the impact of the defendant's foreign conduct on the consumer market in the United States (in accord with the Government's view here), not the location of the original sale of the infringing

product or the location of the trademark owner's business (contrary to petitioners' and respondent's views here).

The Court's precedent also supports the view that an application of a statute can be considered domestic even when foreign conduct is implicated. In *Morrison*, for example, the Court concluded that §10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, "does not punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of'" securities in the United States. 561 U. S., at 266 (quoting 15 U. S. C. §78j(b)). Thus, "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." 561 U. S., at 266. "Those purchase-and-sale transactions are the objects of the statute's solicitude." *Id.*, at 267. Under *Morrison*, a domestic application of §10(b) covers misrepresentations made abroad, so long as the deceptive conduct bears the requisite connection to the statute's focus: the domestic purchase or sale of a security. Similarly, under §§32(1)(a) and 43(a)(1)(A) of the Lanham Act, uses of a mark in commerce are actionable when they cause a likelihood of consumer confusion in the United States, even when the conduct originates abroad.

## II

The Court agrees with petitioners' bottom line that the Lanham Act requires a domestic "use in commerce." See *ante,* at 7–10. According to the majority, the "'use in commerce' provides the dividing line between foreign and domestic applications of these Lanham Act provisions." *Ante,* at 10. Yet the majority does not actually take a stance on the focus of the Act or apply this Court's settled law. Instead, to reach its conclusion, the majority transforms the Court's extraterritoriality framework into a myopic conduct-only test.

Specifically, instead of discerning the statute's focus and assessing whether that focus is found domestically, as the

Court's precedents command, the majority now requires a third step: an assessment of whether the "conduct relevant to the focus" occurred domestically, even when the focus of the statute is not conduct. *Ante,* at 9. Making matters even more confusing, the majority skips over the middle step of this new framework, concluding that it is unnecessary to discern the focus of the Lanham Act because "the conduct relevant to any potential focus" that "the parties have proffered" must be "use in commerce," since that is conduct mentioned in the statute. *Ibid.*[3] In other words, under the Court's unprecedented three-step framework, no statute can reach relevant conduct abroad, no matter the true object of the statute's solicitude.

The Court's novel approach transforms the traditional inquiry at step two into a conduct-only test, in direct conflict with this Court's jurisprudence. The Court has expressly recognized that a statute's "focus" can be "conduct," "parties," or "interests" that Congress sought to protect or regulate. *WesternGeco LLC*, 585 U. S., at ___ (slip op., at 8) (internal quotation marks omitted); see also *Morrison*, 561 U. S., at 266 ("the focus of the Exchange Act is not upon the place where the deception originated"). After all, not every federal statute subject to an extraterritoriality analysis "directly regulate[s] conduct." *Kiobel*, 569 U. S., at 116.

Because precedent does not support the Court's recitation of the extraterritoriality framework, the majority retreats to a distorted reading of the Court's past decisions. The majority relies on *RJR Nabisco*, see *ante*, at 9, but that case does not support the majority's course. The Court in *RJR Nabisco* noted that the Racketeer Influenced and Corrupt Organizations Act's civil suit provision requires an "injury

_____

[3] Even more confusing still, "use in commerce" is all that matters under the majority's conduct-only analysis even though other conduct is also listed as actionable in at least one of the provisions at issue. 15 U. S. C. §1114(1)(a) ("the sale, offering for sale, distribution, or advertising of any goods or services").

to business or property." 579 U. S., at 354. The Court then concluded that there is a domestic application of that provision so long as there is a "domestic injury." *Ibid.* In other words, the Court held that the focus of the statute had to occur domestically. It did not require a third step.

The Court also repeatedly quotes from cases where the Court has said that a domestic application requires that "the conduct relevant to the statute's focus occurred in the United States." *Ante,* 4–5, 10. In those cases, however, the Court first concluded (or assumed without deciding) that the focus of the provision at issue *was* conduct, and only then proceeded to consider whether the relevant conduct occurred domestically. In *WesternGeco*, for example, the Court considered the extraterritorial application of §271(f)(2) of the Patent Act, which formed "the basis for [the plaintiff's] infringement claim." 585 U. S., at \_\_\_ (slip op., at 7). The "focus" of that provision, the Court concluded, is the "act of 'suppl[ying] in or from the United States,'" so the conduct "relevant to that focus" was the defendant's "domestic act of supplying the components that infringed [the plaintiff's] patents." *Id.,* at \_\_\_–\_\_\_ (slip op., at 7–8); see also *Nestlé USA, Inc.* v. *Doe*, 593 U. S. \_\_\_, \_\_\_–\_\_\_ (2021) (slip op., at 4–5) (assuming without deciding that "the 'focus' of the [statute] is conduct that violates international law" and then concluding that conduct relevant to that focus "occurred in Ivory Coast"). In other words, the Court looked to whether the focus of the statute at issue occurred domestically.

In sum, none of the cases upon which the majority relies establish categorically that there must be domestic conduct in order for there to be a domestic application of a statute. Calling this requirement "straightforward," "established precedent" does not make it so. *Ante,* at 10–11.[4]

---

[4] Relying on *RJR Nabisco, Inc.* v. *European Community*, 579 U. S. 325

The Court's transformative approach thwarts Congress' ability to regulate important "interests" or "parties" that Congress has the power to regulate. *WesternGeco LLC*, 585 U. S., at ___ (slip op., at 6). Some statutes may have a statutory focus that is not strictly conduct and that implicates some conduct abroad. Cf., *e.g., F. Hoffmann-La Roche Ltd* v. *Empagran S. A.*, 542 U. S. 155, 165 (2004) (recognizing the long-established view that U. S. antitrust laws "reflect a legislative effort to redress domestic antitrust injury that foreign anticompetitive conduct has caused" (emphasis deleted)). Under the Court's new categorical rule, those statutes may not cover relevant conduct occurring abroad, even if that conduct impacts domestic interests that Congress sought to protect. At bottom, by reframing the inquiry at step two as a conduct-only test, the Court's new rule frustrates a key function of the presumption against extraterritoriality: to discern congressional meaning and "preserv[e] a stable background against which Congress can legislate with predictable effects" to protect domestic interests, *Morrison*, 561 U. S., at 261, including those of U. S. trademark owners and consumers.

The Court's analysis is also inconsistent with *Steele*. Ac-

––––––––––

(2016), the majority argues that the Court has already "acknowledged that courts do not need to determine [a] statute's 'focus' when all conduct regarding the violations took place outside the United States." *Ante,* at 11 (some internal quotation marks omitted). The portion of *RJR Nabisco* that the majority relies upon merely described the Court's holding in *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U. S. 108 (2013), a case that did not involve step two. In *Kiobel*, the Court held that the statute did not rebut the presumption against extraterritoriality at step one and declined to address step two of the analysis (including determining the statute's focus) because the claims at issue did not "touch and concern the territory of the United States" other than through "mere corporate presence." *Id.*, at 124–125. *Kiobel* does not offer any guidance on what constitutes a domestic application of a statute at step two.

cording to the Court, "*Steele* implicated both domestic conduct and a likelihood of domestic confusion," so it offers no guidance in resolving this case. *Ante,* at 8. No court of appeals has read *Steele* that way, and for good reason: *Steele* clearly recognized that infringing acts consummated abroad fall under the purview of the Lanham Act when they generate consumer confusion in the United States. See *supra,* at 2–3, 6–7.[5] Finding *Steele* "of little assistance" to its blinkered approach, the majority reduces *Steele* to a "narrow" case with no application beyond its facts. *Ante,* at 8. *Steele* is no such thing. It addressed the weighty question whether the Lanham Act "extend[s] beyond the boundaries of the United States," 344 U. S., at 285, and has guided the lower courts' extraterritoriality analysis for more than 70 years. The Court should not "put aside" the Court's precedent merely because it is convenient to do so. *Ante,* at 8.

Because the Court cannot ground its holding in precedent, it turns to abstract policy considerations. According to the majority, the focus of the Lanham Act cannot center on consumer confusion, despite *Steele* and the statute's clear textual clues, because any focus other than conduct is too uncertain and "would create headaches for lower courts." *Ante,* at 11. The Court's conclusion, however, is based on the incorrect assumption that "merely a likelihood of an effect in this country" would be sufficient to hold a defendant liable under the Act. *Ante,* at 12 (emphasis de-

——————

[5] It is true that *Steele* involved domestic conduct insofar as the defendant exported watch parts from the United States into Mexico in preparing to affix the infringing mark abroad. See 344 U. S., at 286. Yet the act of exporting those watch parts with no affixed mark did not, without more, constitute an "illegal ac[t] within the United States." *Id.*, at 282, 287. In contrast, the defendant committed infringing acts abroad: "[I]n Mexico City [he] stamped his watches with 'Bulova' and sold them as such." *Id.,* at 285. The Court also did not hold that domestic exportation of unmarked product parts is necessary for the Lanham Act to cover foreign sales.

leted).  What the Lanham Act requires is a likelihood of confusion in the United States, not some abstract and undefined "effect."   The likelihood-of-confusion test comes straight from the statute's text.  As petitioners and the Court acknowledge, it is at the very core of the inquiry under §§32(1)(a) and 43(a)(1)(A).  See Brief for Petitioners 47–48; *ante*, at 9.  Assessing likelihood of confusion may require a nuanced test, but it is the test that Congress chose and that courts already apply.

In addition, any plaintiff would need to do more than point to mere likelihood of confusion; as with any cause of action, the plaintiff must establish all necessary elements for recovery.  For example, although "use in commerce" is not the statute's focus, the statute still requires that the plaintiff establish a "use in commerce."   §§1114(1)(a), 1125(a)(1)(A).  As *Steele* shows, because "commerce" includes all commerce that Congress has the power to regulate, §1127, some foreign sales can fall under the statute's reach.  See also *RJR Nabisco*, 579 U. S., at 344 (the term "'foreign commerce'" does not "mean literally all commerce occurring abroad," but it includes "commerce directly involving the United States," including "commerce between the United States and a foreign country").[6]  Plaintiffs must also generally show, for example, that their "injuries are proximately caused by violations of the statute." *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U. S. 118, 132 (2014).  The Court is thus mistaken that "abstract consumer confusion is sufficient" to recover under the Lanham Act. *Ante,* at 14.

———————
[6] Here, there is no dispute that the Lanham Act covers the products that petitioners sold directly into the United States.  See Brief for Petitioners 11, 41, 44–45.  The dispute centers on products that petitioners sold abroad to foreign buyers.  For a portion of those products, the foreign buyer designated the United States as the location where the products were intended to be used.  Like the watches in *Steele*, those products thus "ended up in the United States."  Pet. for Cert. 6.

The Court also incorrectly concludes that a test that focuses on domestic consumer confusion conflicts with the territoriality principle of trademark law. See *ante*, at 12–14. That principle recognizes that a trademark has separate legal existence in each country where the mark "is registered or legally recognized." 5 McCarthy §29:1, at 29–5; see *Ingenohl* v. *Olsen & Co.*, 273 U. S. 541, 544 (1927) (noting that a trademark secured in one country "depend[s] for its protection" there and "confer[s] no rights" elsewhere). Thus, to obtain the benefits that flow from trademark rights, such as the "right to a non-confused public," the plaintiff must secure those rights in the country where it wants protection. 1 McCarthy §2:10, at 2–24.

A focus on consumer confusion in the United States is consistent with that international system. That focus properly cabins the Act's reach to foreign conduct that results in infringing products causing consumer confusion domestically while "leaving to foreign jurisdictions the authority to remedy confusion within their territories." United States Brief 25–26; see Brief for European Commission on Behalf of the European Union as *Amicus Curiae* 6 ("The test for infringement in the European Union, including in Germany, like the United States, assesses whether there is a likelihood of consumer confusion"). In other words, applying the Lanham Act to domestic consumer confusion promotes the benefits of U. S. trademark rights in the territory of the United States.

The Court's approach, by contrast, would absolve from liability those defendants who sell infringing products abroad that reach the United States and confuse consumers here. That resulting consumer confusion in the United States, however, falls squarely within the scope of the interests that the Lanham Act seeks to protect.[7]

---

[7] In today's increasingly global marketplace, where goods travel

The Court's arguments about the impending "international discord" that will result from the Government's approach are simply overblown. *Ante,* at 12 (internal quotation marks omitted). There is no evidence that *Steele*, which is consistent with a focus on domestic consumer confusion, has created any international tension since it was decided more than 70 years ago. Moreover, as even petitioners acknowledge, purely foreign sales with no connection to the United States are unlikely to confuse consumers domestically. See Brief for Petitioners 44. Foreign companies with purely foreign operations also have at their disposal important defenses grounded in due process and international comity principles, including the ability to dismiss a case in the United States for lack of personal jurisdiction or on the ground of *forum non conveniens.* See, *e.g., Piper Aircraft Co.* v. *Reyno*, 454 U. S. 235, 257–261 (1981).[8]

---

through different countries, multinational brands have an online presence, and trademarks are not protected uniformly around the world, limiting the Lanham Act to purely domestic activities leaves U. S. trademark owners without adequate protection. Cf. *McBee*, 417 F. 3d, at 119 (noting that "global piracy of American goods is a major problem for American companies," and absent some enforcement over foreign activities, "there is a risk" that "violators will either take advantage of international coordination problems or hide in countries without efficacious . . . trademark laws, thereby avoiding legal authority"). To be sure, the Court today does not address whether a defendant operating abroad who sells goods that reach the United States can be held liable under the Lanham Act pursuant to contributory liability principles. See Tr. of Oral Arg. 7–8, 20–21. Still, today's decision significantly waters down protections for U. S. trademark owners. It is now up to Congress to correct the Court's limited reading of the Act.

[8] The Court incorrectly suggests that the Government's position will sweep in foreign defendants with only a minimal connection to the United States. *Ante*, at 12. In this case, for example, the District Court concluded that personal jurisdiction was proper based on a forum selection clause in the parties' distribution agreement, which named Okla-

SOTOMAYOR, J., concurring in judgment

Finally, the Court relies upon the *amicus* brief filed by the European Commission in support of its concern about the risk of international "tension" that the Government's position supposedly creates. *Ante,* at 14. The European Commission filed its brief in support of neither party, however, in line with the Solicitor General's view that a focus on consumer confusion provides a more balanced approach that respects international relations while protecting against trademark infringement domestically. No "sovereign nation" filed its brief in support of petitioners' (and the Court's) restricted view of step two of the extraterritoriality analysis. *Ibid.* And there is no "tension" in any event. What the European Commission "warns this Court against," *ibid.*, is adopting respondent's sweeping view that all foreign uses that confuse consumers abroad fall under the scope of the Act. See Brief for European Commission on Behalf of the European Union as *Amicus Curiae* 6 (explaining that "infringement" occurs in the European Union when there is "a likelihood of consumer confusion" there).

\*    \*    \*

The Lanham Act covers petitioners' activities abroad so long as respondent can show that those activities are "likely to cause confusion, or to cause mistake, or to deceive" in the United States and can prove all elements necessary to establish liability under the Act. 15 U. S. C. §§1114(1)(a), 1125(a)(1)(A). Because the courts below did not apply that test, I agree vacatur and remand is required. The Court's opinion, however, instructs the Court on remand to apply a test that is not supported by either the Lanham Act or this

---

homa as the forum of choice, and because petitioners purposefully directed their activities at the United States. *Hetronic Int'l, Inc.* v. *Hetronic Germany GmbH*, 2015 WL 5569035, \*1–\*3 (WD Okla., Sept. 22, 2015); *Hetronic Int'l, Inc.* v. *Hetronic Germany GmbH*, 2015 WL 6835428, \*2 (WD Okla., Nov. 6, 2015). The Tenth Circuit affirmed that determination, *Hetronic Int'l, Inc.* v. *Hetronic Germany GmbH*, 10 F. 4th 1016, 1027–1032 (2021), which petitioners do not challenge before this Court.

SOTOMAYOR, J., concurring in judgment

Court's traditional two-step extraterritoriality framework. I therefore concur only in the judgment.[9]

———————

[9] The jury returned a verdict for respondent on all counts in the complaint, including the breach of contract and tort claims under state law, and awarded respondent more than $115 million in damages. See App. to Pet. for Cert. 8a, 134a–137a. The Court's decision today on the claims under the Lanham Act does not affect the relief granted on other claims, which petitioners do not challenge before this Court.